3-17-0-8-2-1. In re Marriage of Joan Serdar, Appellate by Kathleen Brock and Michael Cannulli, Cross Appellant by Michael Cannulli and Richard Serdar, Appellant by Robert Kramer. Thank you, Mr. Kramer. Good morning.  For the record, Robert F. Kramer on behalf of the Appellant responding to Richard Serdar. This is the appeal of the Judgment of Dissolution of Marriage that was entered on November 7, 2017. The parties in this marriage, in this matter, had been married at the time of 25 years. They had two children who were at the time 14 and 16 years of age. The issue that affects many of the other issues that I have brought up on this appeal is whether the court's determination of Richard's historic income and then determination of his potential income and imputation of income was an abuse of the court's discretion. We think that it not only was an abuse of the court's discretion, but that it was contrary to Illinois law. My client in this matter during the course of the marriage was a carpenter. He had typically three sources of income. He would earn W-2 income for the union. All the evidence shows that he would work approximately two to six weeks a year for the union. That was about the amount of work that was available to him. Additionally, he would receive income from unemployment each year. And then he would receive income as a sole proprietor for a business that he conducted where he would do carpentry work under the name of Serdar construction. And that percentage of his income was on the average? The percentage of his income, typically he didn't make very much money from the business. Typically the expenses that he paid would significantly reduce or put him in the negative sometimes in regards to the income from the business. But the reason for that is that when you have a business, there's two different types of expenses. You have direct expenses, which are expenses that you put into your base for jobs. That would be material that you need to hire somebody to do the labor, permits, things like that. But then you also have indirect expenses, which would be your general insurance coverage for your business. If you've got vehicles, you need insurance. If you have a car loan, you need to pay for tools, things like that. And when both of these things were put together, typically his business didn't generate... Was there a claim for depreciation? There was on the tax returns, but there isn't in regards to our argument in determining what his support obligation is. It's not been a factor in the support obligation? What was the factor when he paid his taxes? Well, he would claim the depreciation on his tax return. We're not saying that he should be able to claim the depreciation in regards to determining what his income is for support. That's the reason. As I understand it, it was not a factor in the support obligation. Correct. That's correct. So when the judge went ahead and at the time of the trial, he was no longer doing the carpentry work on his own and no longer was looking for union employment. He had obtained a full-time job working 40 hours a week doing maintenance for a church where he was earning a salary of $30,000 a year. The court found that he was underemployed. And what it did was it took an average of what it deemed to be his income for 2013, 2014, and 2015. And then added $8,000 on to that claiming that he had earned cash or an approximation of cash he would have been able to earn during the course of the year. The problem we have is that when it determined his income, it took his W-2 income. We don't have any issue with that. It took his unemployment income. We don't have any issue with that. But then it took the gross receipts that he received from his business without giving any deduction for any of his business expenses. And that we think was an abuse of discretion and contrary to Illinois law. And those expenses were put into evidence. The 2013 joint tax returns of the parties, the returns that were signed by both the appellate and the appellee, those had all the attachments and schedules. There was a Schedule C that listed the expenses for the business. That was in evidence. The tax return for 2014, likewise, was a joint tax return. It contained all the attachments. It contained Schedule C that listed the business expenses. And in 2015, the parties did file individual returns, but again, those expenses were consistent. Plus, there was testimony in regards to that tax year that there was $23,924 that was shown in gross receipts. It was money that Mr. Serger just used as a pass-through. He had allowed his wife at the time, his brother, to go ahead and utilize the name of his business so that he could make a bid in a village that required him to be linked up with a construction company as opposed to being an individual bidding for the job. And there was evidence to show that that money went through his account and then it went directly to Jones' father and he never received it. Yet, the court, in its calculations, didn't allow for any of those deductions. Additionally, the court imputed $8,000 of cash payments to him each year. And there just was no evidence of that at all. The only testimony was Ms. Serger saying that she remembered that when they were first married that he said he liked that he paid in cash. And when she was asked on a cross-examination whether or not she knew whether he claimed it on his tax returns or not, she didn't know whether she had any witnesses that he paid received cash. She didn't know. And Ms. Serger testified that any cash he received was reflected on his income tax return. And there was no numbers or anywhere in the evidence that would even allow somebody to come up with this $8,000 a year cash payment. So... You said there's no evidence that he was paid in cash. Weren't there some photographs or videos of him working at jobs? I'm sorry. I guess there's no evidence that any cash he received wasn't claimed on his income tax returns. That's what I'm saying. There's no evidence in regards to that. The photographs, I mean, there were photographs of him taken from a truck showing him wearing meat hats and things like that. But those were, again, jobs where he either indicated that he received a job and was paid for it and claimed it, or it was indicated that he was there and didn't actually perform the job, whether it was a bid or something else. I'll have to read the record. I thought that in one of the briefs there was a discussion about he was either photographed or videotaped at a job that he had not reported. So I'll check the record. Sure. And I hope I'm not mistaken. You wrote the briefs a long time ago. This, as you know, is a long record. I have to say, I've never done an appeal where I wasn't the trial attorney on the matter, and this was a difficult one to seal. I understand. I understand. So we think that if you take into account the deductions that we believe have to be taken into account, that the job that Mr. Serger had at the time of the trial, earning $30,000 a year doing maintenance for the church, actually, and as he testified, is as much or more than the income that he was generating during the course of the marriage. The reason he was able to have this business and not have it make money is because he was married to Mr. Serger who made a substantial amount of money, and that allowed him to do that once that money was no longer there. He couldn't do that anymore. He let his welder's certificate last. He did let his welder's certificate last. He, and I don't know if this is, I don't want to speak, it's not on the record, but there are multiple types of welder's certificates, and the welder's certificate he had didn't really allow him to do the type of welding that would have been available for him in the area that he was in. So he wasn't able to make any substantial money with the welder's certificate doing that. He's also, at the time of this trial, 52 years old, and usually when you're doing welding, it's not something where you're not on a scaffolding or laying down underneath something. It's a job that requires you to be mobile. Mr. Serger, there was testimony in regards to him having two herniated discs, having had a torn rotator cuff, having had broken ribs, being diabetic, and all things that made it difficult for him to go ahead and do physical, laborious jobs that maybe somebody who was in better physical condition or younger than him would be able to do. And is that why he didn't mow the lawn, so that he could take the bids from the city? No, I don't know. I think this. I don't know that he knew that he was going to get any citations in regards to not mowing the lawn. I think that was a surprise to him, otherwise I don't think he would have made the bids to the city. But he made the bids to the city, and I think the not paying the fines was more of a result of there not being a substantial profit margin in those jobs that he bid, as opposed to him shying away from income. As he had testified before, he tries to build in a 10% profit margin into his bids to the city of Joliet, and that was the bids that were talked about in this matter. And that 10% is if everything goes well and as planned. And if all of a sudden we have this additional money to go ahead and pay the fines, at a time when he's going through a divorce, he's got attorney fees, he's got an issue where he's trying to figure out how to pay his own living expenses, I think that was the reason why he didn't go ahead and pay that. And that sort of comes back to some of the other things that occurred that put my client in the situation that he was in, is that Ms. Serger, the evidence showed, earned somewhere in the area with the perks she had about $96,000 a year. My client's trial attorney had made multiple motions and requests for interim attorney fees for my client to be able to get some type of temporary maintenance. Ms. Serger's attorney had gone ahead and made motions for child support also. But this case being filed sometime in 2015 and not getting done until the end of 2017, none of those motions were heard. And as a result, we've had a situation where instead of having determinations pre-judgment, we have all these things standing post-judgment. We also have a situation where my client didn't have substantial income come in, and that's where we get into some of the other issues in regards to the dissipation. Counsel is two minutes. So Judge, we believe that the $30,000 that Mr. Serger was making doing maintenance at the time of the trial is indeed what his potential income was. We believe that the court erred in imputing on top of that an additional $37,606 of income and saying that he had income potential of $67,606. There's no evidence of that at all anywhere in the record. And we do think that the court had an obligation to take those business expenses and consider them and subtract that from his income. But we think if the court would have done that, the court would have come to the same conclusion that his earning $30,000 a year is what his income potential is. And if that's the case, then suddenly we have a child support issue that, instead of being $969 a month, should be underneath the old statute $568 a month. We have a situation where instead of a court finding that he doesn't have any right under the statutory guidelines to receive maintenance, we have a situation where he is entitled to receive child support. I have a question about the Harley-Davidson motorcycle that was purchased. At the time it was purchased, was it financed? Was it a cash payment? Do you know? It was financed, and it was his parents who testified were making the payments on the Harley-Davidson. It was financed, but the finance was in his name. Were there outstanding attorney fees at the time he bought the Harley-Davidson? Yes. So, Judge, in a nutshell, we are asking that the court find that it was an abuse of discretion for the trial court to compute the income to Mr. Surter. We're asking that all matters that are affected by this error be readdressed by this court or by the trial courts so that we have support numbers that reflect what my client's actual income is, or potential income is, and so that he has the right to receive maintenance or spousal support. I didn't get the ability to address the issue of the dissipation of the 503G trust, but maybe I'll be able to do that in the second round. Thank you. Thank you, Mr. Kramer. Mr. Cannuli, you'll be doing your primary argument on the cross appeal. Mr. Kramer. Justice Rackabilly. Good morning. Mr. Fay and Justice Carter. I don't know if I've had the pleasure of appearing before you before, but my name is Michael B. Cannuli. I have the pleasure of being an attorney in the state of Illinois for 41 years, and I'm the cross appellant in this case. I understand that I have five minutes to address these arguments with the court, so there are just some things that I would like the court to consider. Number one, there are three things I'm going to ask of the appellate court. Number one, to find that the way in which the interim attorney's fees were handled did not comport with Section 501C1. It didn't comport because 501C1 is intended to level the playing field, and in this case, the statute also calls for the court to set an expeditious hearing on the interim attorney's fees. I think the record's clear that Ms. Serdar in her brief acknowledges that she had paid her attorneys $80,000, and I would suggest to you that from the evidence in this case, Ms. Serdar had a salary of about $87,000, but when you factor in all of her benefits and perks, it was closer to $115,000, and that Mr. Serdar was typically a gentleman who made in the low 30s to 35. When I filed these interim fee submissions, I had filed several of them because as time went on, the amount that was being sought by the interim fees changed. I think particularly egregious is the fact that there was a home equity loan, and you had $29,000 available to it, and Ms. Serdar took it upon herself to go to the home equity loan, and she withdrew all of the money, basically depleted any liquid funds that were in AmeriCorps estate that could be used to pay fees. Mr. Serdar didn't do that, but Ms. Serdar did, and she admitted and took $27,500, gave that to her lawyers, and spent $1,500 on personal expenses. I brought that to Judge Kennesaw's attention. I asked either for an order to return the money or to disgorge the money or to share the money in some fashion. I'd like you to know that there were no interim fees made in this case. The balance on the fees was probably about $38,000 when it started, and then there was a 20-day trial, so the fees in the case were obviously significant. The total fees were $80,000. I'm not going to tell the fees. I'm sure my fees were over that, Judge. That leads me into the 503J contribution issue. When it became somewhat clear to me that Judge Kennesaw was not going to allow an interim fee hearing and there would be no balancing of the claim field as such, I filed a contribution petition. You're allowed to do that either prior to the trial or within 14 days of the trial, and when I asked the court, do you want to deal with contribution in the trial itself? So I knew as a lawyer who I put on that evidence about what my letter of engagement was, what the fees were. Judge Kennesaw said, no, we're not going to deal with the fees in the trial. We'll deal with the fees after I close the case. So for that reason, there was no evidence put on in the trial other than the fact that Mr. Cerda paid $26,000, all of which he had borrowed from his parents, and then I think he made $4,000 or $5,000 to a prior attorney. So there was no contribution in there. Let me understand what you're saying. You have received $26,000? From Mr. Cerda. From his parents. All of which was borrowed. All right, thank you. Correct. I made that with the promissory notes because he didn't have it. And the remaining balance, I have not looked at my last bill, but I'm sure it's significant, Judge. It was $40,000 two months before the trial. I'm sure that bill was over $100,000 at this point, in 24 days of trial. It might be $125,000. And how much were the assets that were provided? Well, it depends on how you value balance. He had some interest in some private health companies, but they had a house that was paid for. They had a vacant lot that they paid $600,000 for. And the court imposed a 503G trust on it. So now that's not available, at least at the moment that this judgment stands, on the 503G. And let me answer the question. Cases like this don't turn into 21-day trials unless there is a lot of hard feelings. And I say to my clients, it's not necessarily the work that the lawyers have to do. It's the ability of people to talk and find common ground and cooperate. In this case, it was very difficult. She had an appearance for a great law firm. She was exceedingly well represented by that Chicago law firm. And then Karen Conte left the firm and she took over the case. So it was a difficult case. I thought they had good lawyers on it. There were some real issues, as you can tell from the transcript. Counsel, one minute. Thank you. On the 501, on the 503J, I agree the court didn't need to do a new hearing on the assets or the ability to pay. But the court didn't allow me to file an updated petition to even say what my fees were and to show that my rate was usual and customary. I think it was 325. And that the fees were reasonably necessarily deferred. So, yeah, there has to be an evidentiary hearing on that part of the case. Now, I'm asking the court to remain to a different judge. Why am I doing that? Because I think the court disregarded the obligations of 501C1. And the effect of that was there were no legal fees paid. There was no interim attorneys' fees or leveling of the playing field. When I got the judgment, and the judgment denied fees, my first thought was, how can the judge deny fees? She doesn't even know what my fees were. So in order to go to the due process, you have to know what the assets are and the ability to pay. But you have to know that the rate was usual and customary, that the fees were, that they were reasonably and necessarily inferred. And then how those fees should be apportioned. What the wife's fees were, what she paid, what her own paid fees were. None of that happened. So, as a matter of fact, you won't even find the word contribution in this judgment. It was as if it didn't exist. But it was filed. It was timely. It was pending. I was following the instructions of the court to deal with it after the closing of proofs. And I think if you send this back to Judge Kennison, if she hears it, she's already got my name up. I think if she said, no fees in this case, so that you have each the ability to pay, which, by the way, he has no ability to pay. If there's a 503G trust, I'm the only remaining asset. He lost his house. I would not feel that I would be presenting a case to a judge that had no remand. And that's all I ask for. If the case was remanded without us deciding whether Judge Kennison should or should not hear it, do you have the opportunity to file a motion to substitute for cause? I think an attorney always has an opportunity to substitute for cause. I absolutely do not have the right to move for substitution on contribution opposed to proven. Ah. Absolutely. Thank you. And it is my experience, if you wish to file a motion for cause against a trial judge, exceedingly difficult. I'm sure if you look at most cases, it's probably not even 2% or 3% would ever be allowed. That would just bring more limitation in my mind. You could file a petition for cause at any juncture. I'm sorry? You could file a petition for cause at any point. I believe you can. I would agree. But you're saying that you couldn't on your contribution claim. I think an attorney has an independent contribution claim. The right of contribution is independent to the attorney. So could I do that? I'd actually have to give that some thought. Do I want to do it? Absolutely not. I think that would bring more limitation in this case. And I do think a judge who didn't hear the trial still has the ability to hear the evidence and make an informed and fair decision. According to the due process. I don't think it was due process. It's a lot of money. I worked very hard. Thank you. Thank you, Mr. Cannulli. Ms. Rock? Good morning. Good morning. My name is Amy Rock. The issues raised on appeal by Mr. Kramer today on behalf of his client are all subject to the abuse of discretion standard. And as this court knows, that means that the trial judge is supposed to be given the highest level of deference. When looking to overturn, the burden is on Mr. Kramer to demonstrate that Judge Cannulli's decisions were clearly arbitrary or clearly unreasonable. What was the amounts in the debate about marital property? The amounts between the two sides. It was an excess of $500,000 marital estate. Mr. Kramer also had a $70,000 non-marital estate that was awarded to him. Also to be given the highest level of deference is the judge's determination regarding credibility. And credibility is a factor in assessing the evidence of income, whether or not there's a support obligation, and whether or not there's dissipated assets. And in going through Mr. Kramer's brief, you'll notice that not one mention is made to the judge's determination regarding credibility in this case. Why is that? It's likely because the judge found that virtually nothing Mr. Kramer said regarding his finances was credible. As counsel noted, this is a pretty substantial record, so I won't go through all of the points that led to this determination, but I did want to highlight the fact that Mr. Serdar was essentially caught on the stand having hidden a bank account that he opened during the litigation. A bank account that he opened with a check that he did not disclose the work that he had done of nearly $10,000. And this is after he claimed on the stand under oath that he had been depositing all checks made out to his construction business into his female parent's construction business account, and all checks made out to himself into his female parent's personal account. He also didn't disclose the jobs that he was confronted with, receipts on the stand or evidence that he had been performing work for the office club. In fact, he actually pulled the check out of his pocket, which had never been disclosed. He didn't disclose that he was the winning bidder on nearly $89,000 of work for the city of Joliet, which he says he didn't take because he had $2,600 in fees that were owed to the city. At the same time, he had twice that amount in his hidden bank account, and he also disposed of all of the documents relating to those Joliet bids despite orders to disclose that information. He also claimed he had health issues. However, he didn't provide any medical proof. He didn't provide any expert testimony. He produced no evidence of these conditions. He was confronted with videos and photographs of him performing a physical labor, removing items from storage at times that he did not have corresponding jobs that had been disclosed. There were photos of him at what were believed to be work sites. He contested that they were work sites, however. He also continued to do physical activities in his personal life. He was playing softball. He rode his mother's motorcycle without any issue. That motorcycle he purchased during the case. How does he respond to this point about? Well, he says that the court was intent on finding him credible. He claims to know the length of the trial. He claims to know how the trial was organized and issues with exhibits. However, none of these things affect Mr. Serdar's ability to tell the truth and disclose all of his income and assets. Essentially, all of Mr. Serdar's arguments today are dependent more on Judge Penison's determination regarding his credibility. If you depend on his version of the facts, he's asking you to rely exclusively on his tax returns and on his Social Security wage history. Social Security wage history doesn't disclose the income he was receiving from his solely-owned business doing construction and plowing jobs. The tax returns are also dependent on accepting the information that he provides to the accountant as credible. Mr. Serdar testified that she had nothing to do with the preparation of the tax returns. Mr. Serdar provided all of the information to the accountant. She had no access to his business information because he kept his money in separate accounts. He kept his business in separate accounts. If we look at the tax returns themselves, they are also incredible. Mr. Serdar is asking that you accept the fact that during the three years of litigation when he was claiming that he was broke, he lost $46,000 of actual cash, not including appreciation, over that three-year period. I don't know anyone who was broke who was able to shell out $46,000 over three years without showing some sort of associated debt, and he did not do that. This is all cash loss according to his tax returns. With regard to those expenses, the burden is on Mr. Serdar to establish the expenses because he's the one with superior access to that information. As I said, he kept his financial information separate because Serdar had no access other than what she was able to find in discovery during the case. He provided only general testimony regarding what his expenses were, and on one occasion he couldn't even remember what charges on his credit cards were. So there wasn't any specific testimony really regarding what the expenses were, nor did he point out to the court in his documentation what those expenses were. Additionally, even if the court did err in not deducting expenses that Mr. Serdar did not establish, if you look at what the court did with child support, Judge Kennison gave him credit for tax liability. If you look at his 2014 and 2015 tax returns and tax documents, Mr. Serdar did not actually pay taxes in those years. In 2014, he had $156 in the holding from his W-2 earnings, but the parties received a refund that year. So at most, he had $156 out of pocket for that. In 2015, he didn't pay taxes. If he got at least $20,000 worth of credit for taxes, he didn't actually pay. Additionally, if you compare it to the other evidence that was provided to the court, the Harley application for credit was submitted. And even though Mr. Serdar contested that he had signed it, it reflected $50,000 in income. And that was consistent with the $50,915 that he deposited into his personal account in 2015. And that, again, is only the money that he deposited into his personal account. It doesn't include the checks that he was caught not depositing. He also admitted on the stand that he had cash on the road at home. He claimed that it was money from his parents and from people whose tires he changed, but it was an indication that he had cash available to him that was not deposited into his account. And even if this court would have determined that his income was only the $30,000 he was earning from his job that he obtained between the trial dates, that is only one factor that the court is to consider under Section 504 of the Illinois American Dissolution of Marriage Act. Mr. Serdar actively hid his business activities and income from his wife and from the court. He's now complaining that Judge Hennison extrapolated what she believed was his income from unlimited information that Mrs. Serdar was able to get during discovery. I believe that accepting Mr. Serdar's petition or position on this would incentivize litigants from incentivizing them to willfully withhold and destroy information as Mr. Serdar did in this case. Turning briefly to... Based on the findings of the trial court. Correct. Turning to Mr. Camilli's appeal in this case. On the one hand, we have Mr. Cramer arguing for ignoring key findings regarding the credibility of his client in the record. On the other hand, we have his former attorney who is asserting information exists in the record that does not. Mr. Camilli says repeatedly throughout his brief statement such as, the judge specifically told the attorneys that contributions would be considered after the closing of proofs and not in a financial trial. Or the court specifically directed that it would consider fees after the closing of proofs and was telling the attorneys they were not to address fees at trial. However, the only citation to the record contained in either of his briefs where contribution or fees is discussed is when the judge states on day four of the 20-day trial that it would be dealt with later. A later reference that's included in my brief indicates that it was stated that by Mr. Camilli, he didn't even know if his client was pursuing a contribution anymore. He wanted the judge to consider the amount of fees that Mrs. Serdar had paid and perhaps resolve it that way without the need for further litigation. This is consistent with what's in his closing argument wherein again he says that he's asking for Mrs. Serdar to repay his home equity line of credit in the alternative that she deserves fees. I would also like to point out a statement in Mr. Camilli's reply brief both on page one and page three wherein he essentially says that the judge ignored his contribution petition, doesn't even mention it in the final judgment, merely denies the interim fee petition. If that's the case, then I would contend that this court did not have jurisdiction over the issue of fees because if it wasn't decided by the judgment, it's still pending. I would also like to note that the court in Mantee, the fourth district case in 1991, had said that the parties cannot enter into such a battle and expect to come out unscathed. It's unreasonable expectation to anticipate that the trial court will automatically require the other party to pay such attorney's fees regardless of one's conduct during the litigation. Judge Tennyson in this case heard for 20 days of trial. She heard ample evidence regarding both parties' ability to pay. She heard ample evidence regarding the assets in this case. She also heard ample evidence regarding the unnecessary increase to the cost of litigation to the point that she invited Mrs. Serdar to file a petition for attorney's fees under 508B of the Illinois Marriage and Dissolution of Marriage Act, as well as 219C of the Supreme Court Rules. Presumably, then, the only information that was missing was the amount of fees that Mr. Serdar had incurred. Mr. Serdar, when the trial resumed in November of 2016, presented an updated financial affidavit to the court. He presented an affidavit that contained the amount of fees under oath that presumably his attorney was owed at that time. Not only that, but prior to the judgment being entered in November of 2017, the judge ordered in the order of September 26, 2017, that the parties were to exchange updated financial affidavits with regards to some post- well, not really post-decree at that point, but some interim litigation. And both parties were to provide courtesy copies to the court. Mr. Serdar filed, with support, on October 10, 2017, another updated financial affidavit that reflects that the fees owed to Mr. Camilli were $144,000 and some change. And that's located in the record of C-1616. The judge had information on the fees, information on the parties' incomes, information on the assets and how they were being divided. What prejudice did Mr. Camilli suffer? If the judge knew the amount of fees and knew what the income was going to be, must she determine the fee? Mr. Serdar had the ability to pay his own fees. There was no reason to go into the question of were they reasonable. It's a three-part test for determining contribution. Can the party asking afford to pay? Can the party being asked to pay afford to pay? And were the fees reasonable? If one of those isn't met, the others don't essentially matter. With regard to the interim fees, this case was actually set for trial in August of 2015. Mr. Serdar brought in new counsel as mentioned two weeks before trial, a trial at which his former attorney had agreed that the prior petition for interim fees would be set over to. Counsel has two minutes. It's Mr. Serdar's actions that delayed the hearing on his initial fee petition. Mr. Camilli then waited another four months to file his first interim fee petition, which was presented the next day. So the December 3rd and December 4th orders were essentially the presentment of his interim fee petition. He was scheduled for hearing on those fee petitions in January of 2016. The record isn't clear why it got continued. There is a reference in the motion filed by trial counsel that the trial judge didn't have time that day. It got reset for another hearing date. In the interim, a motion was filed setting forth good cause, why it should be continued over an additional six or seven weeks to the existing trial date so that there wasn't duplicative litigation. Mr. Camilli doesn't provide any transcripts from these interim hearings. He indicates that his objections and the reasonings are on the record. However, if you look at both the orders from those dates and the docket entries, there's no reference to an objection in those orders. There's no reference to an objection in those docket entries. The only reference to an objection is in the February 25th, 2016 order that isn't subject, is not included in this appeal. Unless there's any further questions, I'm concluded. I have a couple. I always do. He was working for a church for $30,000 a year. Is there evidence in the record? Were there fixed hours? Was it full-time work? I believe that there wasn't evidence that it was a salary. It was an hourly wage, and he anticipated that he would earn $30,000. He had only worked there for a few months at that point. The hourly rate? I would have to guess, but I think it was around the rate of $15 an hour. That would put him in how many hours? I don't know. I don't believe that there's a guaranteed number of hours, but I don't recall there being specific testimony beyond what he anticipated he was going to earn. It wasn't a 40-hour week. I'm unsure. With regard to the home equity loan, I think that was taken out, $29,000, give or take. Was that accounted for in the distribution of marital property? To an extent, the house was ordered to be sold. By default, it was addressed because the property was being divided between the parties. There was no requirement that it be added back into the estate. However, Mr. Serdar never filed a dissipation claim. Do you know how much was paid on the Harley-Davidson during the course of the litigation? I don't. I do know that Mr. Serdar testified that he received money from his parents and it was paid by an enrolled order, so that would have to be taken into account as well. $70,000 in non-marital assets that he received, were they liquid assets? Were they cash accounts? The judge assigned those values to the assets of his business, and then I believe there was also a small counter-insurance policy with cash value. I don't remember specifically, but it was primarily the assets for the business that he could not conduct. You've answered my questions. Any other questions? Thank you, Ms. Wright. Mr. Kramer, Graybottle. In regards to the credibility issue, I think we can address that in our reply brief, but we do have a situation where we have, again, joint cash returns that are signed by both of the parties. Those are signed under penalties of perjury for 2013, 2014. In 2015, the parties did file very separate tax returns in regards to that, and those tax returns do itemize the expenses that Mr. Serdar claims in regards to his business. In regards to the value of Mr. Serdar's business or property that he was awarded, that was for equipment that he had that was pretty rare, more than 25 years old, and that amount, what the value of that is, again, something it appears that the judge came up with without there really being any evidence in regards to what the value of that equipment was. Mr. Serdar... So your client put no evidence about the value of that equipment? There was little evidence on it. That little to no evidence on the record is what the value of that is. I would say this. In the record, there is what some of the items are. I mean, there was a comment about the items. Yes. The items were commented on. Right, right. In regards to my client's job at the time of the trial, he was a W-2 employee for the Catholic Church, and he earned $15 an hour, and it was a full-time job. And he said that it would be 40 hours a week, so that he would be earning somewhere in the area of $34,000 a year. That's the way the determination was made, about the $30,000, $34,000. That's correct. Was there some evidence that he took some time off from that job to do something that he had bid on? There was evidence in regards to that. So he had the ability to do other work. He did indicate that the hours that he had to maintain were flexible in regards to the Catholic Church. So it wasn't that he had to be there 9 to 5. However, he did put in full-time hours, but the hours he could adjust as to whether it would be during the week or on the weekend or when he would start working. He didn't punch in or out? No, he didn't punch in or out. He didn't have to do that. Again, going back to the credibility issue, there was a comment made in regards to him entering and checking court. When we refer to a lot of the issues the judge had with these interim expense affidavits, the problem is that they're sort of designed for people who have recurrent income, the same income coming in. So you can put down what your paycheck is, what your taxes are. It's not designed for somebody who is having intermittent income or is having – if you put a check that you're expecting to receive in a month down on your interim expense affidavit, it's a very difficult form to have a great accuracy on unless you're a person who is receiving income that's similar each week or each month in regards to that. I think the check that was referred to, I don't know how you can disclose anything more fully than bringing it to court and showing it to the court that you've received the check. He did that, but again, where would you put something like that on an income expense affidavit, a one-time payment? In comparison, though, to what he put on the loan application, are you suggesting that his reporting of $50,000 in the income was equally difficult to ascertain? Well, I think his testimony was he did not fill out that loan application. He did not put $50,000 down on that loan application Who does he assert filled out the loan application? He would assert he does not know. I mean, his testimony was consistent that he didn't fill it out, but he didn't sign it, and then they provided some type of a document that had a docu-sign on it that says, hey, I don't use – I never use a docu-sign on these computers. Which came from the loan. Pardon? Which came from the loan application. I mean, that was part of the loan application. That was – yes, that was the loan application, but again, he claimed he did not complete a loan application, saying he needed $50,000 and did not sign. Did he return the money he received that he hadn't applied for? Well, I don't think he actually received the money for the loan. I think it was used as a finance – the motorcycle was financed, and now – But he acknowledged the debt. He acknowledged the debt of the daddy motor home. The $50,000 wasn't the amount of the loan. It was the amount of income that was put on the loan application. But if he didn't fill out the application, then the debt wouldn't be his. I don't understand. It was the motorcycle. But I guess he could go ahead and bring the motorcycle back and say, hey, I didn't fill out the application, but his intent was he did purchase the motorcycle, and his testimony was – Long and short of this, he got a loan for the motorcycle. I mean – Yes. So the loan application was to get a motorcycle, and he got a motorcycle. Correct. Just curious, new or used Harley, and what was the purchase price? I don't know that. Do you know the amount of the down payment? I don't know the amount of the down payment. And then the other issue the counsel brought up is basically arguing that the tax returns for some reason aren't accurate. Why would somebody have a business that is showing a loss? Again, it goes back to the direct and indirect costs in regards to that. And it's one of the reasons why he had to go ahead and obtain W-2 employment was because he couldn't do that if he wasn't married to Ms. Serger. He didn't have the means to be able to run a business that wasn't making money. But Ms. Serger also had a business during the course of the marriage. She had this Aquachat business, and that was a business that she testified made no money at all either, and she continued to run it until she let it dissolve. And even after it dissolved at the time of trial, there was still a bank account for that business. And again, she was operating that business, and it was not generating any money either in regards to that. She got money from her employment? Yes, yes. I'm not saying she wasn't earning any money, but she was heading that business and wasn't earning any money from this Aquachat business. And again, if my client didn't have Ms. Serger, he wouldn't have been able to run his business either. She was the reason why his businesses couldn't exist. She bankrolled the businesses? Well, she bankrolled the family expenses, I guess, so that these businesses could then rely on his businesses for support. Thank you, Your Honor. I appreciate it. Thank you, Mr. Kramer. Mr. Cannulli. Thank you, Justice Ginsburg. It's an unusual circumstance of having tried this case but not doing the appeal. I just couldn't understand it any more better than this case. But when I get done responding to counsel's comments, if the court has any specific questions about the case, as an officer of the court, I'm happy to answer any questions about the motorcycle, the job, or anything else. But for purposes of my five minutes, if I may, Justice Conner, you asked me the nature and extent of the marital estate. And I'm sure you're thinking, well, you know, she racked up $180,000 in fees. Cannulli's census fees are probably $130,000 or $140,000. What was the marital estate? That's a perfectly fair question. But what I would like you to know is that most of the litigation prior to the trial had to do with the children. There was a boy who had special needs, and there was a daughter who was a rock star performer. This is sort of how these kids left the house and moved into a home that her parents bought her  They have disagreements over custody. How does this relate to your contribution, Clayton? Because Justice Carter asked me what was the extent of the marital estate, and I think the court wants to know why the fees were large in this case. So I'm trying to explain. There were psychologists involved in this case. This is certain I wanted to medicate this boy. My client said, absolutely not. You're not going to medicate my son. He doesn't need it. We had psychologists saying that he didn't need to be medicated. She filed motions to medicate him. So they argued about custody. They argued about parental decision. They argued about burden time. We had a guardian in that line room. We didn't get to an allocation judgment until the day of trial. To answer your question, much of it had to do with the children. Counsel makes the comment that, well, So how much? I'm sorry. So how much was all? Oh, gosh, I would imagine that probably 65 or 70 percent of my time prior to the financial trial was on the children. How much was the estate? The marital estate. They had a vacant lot that they paid 600 for. They had a house that he actually built with his hands. It was probably worth, if I recall, $200,000, $300,000. His business was non-marital. So when you put everything in, there were disputes about what the value was of privately held businesses that she had that she says she closed during the war. So probably $700,000 to $900,000 all in. And the assets were a house. I mean, things that normally aren't heavily disputed. A house, a fund. Vacant lot? Vacant lot. I keep calling that the fund. His business? His business was non-marital. Correct. Well, what we did is we figured out what equipment and small tools and everything that he had. I think it was the truck. So we agonized all that, and they said this is what it is. It wasn't much. Counsel? It was enough to pay a large chunk of your fees, though. No, it wasn't. It wasn't valued at $70,000? The $26,000 came from his appearance. They wrote me a check. But the premarital assets that he had were worth $70,000. I heard that number. I don't know how to get what it was. It sounds a little high to me, but he had some equipment, he had some tools, things that he used in his construction. I think maybe one of the trucks might have been bought. But there was a termination of the non-marital right by the judge. Yes. I don't think we argued about that at all. They asked us for the small tools and equipment in the truck. And so, I mean, as I understand it, there was a submission by the parties of what they thought it was. Yes. And there really wasn't a real big conflict about the value of the non-marital. Correct. Am I right on that? Yes. The dispute was whether she had an interest in these privately held businesses. Our court always has the obligation to double-check our jurisdiction. And Ms. Rock has made a point that if you're arguing there was no, the judge didn't rule on your contribution petition, that we don't have jurisdiction to review it. Would you speak to that? Yes. I did think about that after the judgment came out. I think when you look at the judgment, the genesis of the judgment is there will be no fees awarded in this case, and each party pays their fees, and each party has the ability to pay the fees. And I did make the point that the judge didn't even make reference to contribution. The judgment says in paragraph 4.8, interim and prospective. So, if you want to take the position that the court in the judgment didn't dispose of contribution, I think that was your position. I could be mistaken, and I'll listen to oral arguments again, but I think that was your position that the judge didn't even consider. I said that the judge didn't even mention contribution. It was as if that petition had not ever been filed. So, let me get clear on this. Are you saying this is final judgment or not? I'm saying it is a final judgment. I'm saying that the court denied it. The practical effect of this judgment, even though the court didn't add the words contribution, was to deny fees. Whether you would call it interim or whether you would call it contribution, she made a specific finding that both parties had the ability to pay. She denied fees under any circumstances. Pardon me? She denied fees under any and all circumstances. Yes, she did. Because, Justice Wright, it's something I thought of when I did the appeal. Do you set this case back down and say, well, there's nothing in the judgment that doesn't say contribution, not a final judgment, all of this was or not, and we're going to go back and then come back at some later point in time? I hope that that's not the practical result because these people need closure. Counsel makes the point on contribution. There's only three things. His ability to pay, her ability to pay, and reasonableness of necessity. That's not quite right. He had to know what the fees are. The judge said he didn't know what the fees are because there was never an update so how could a court deny fees without knowing what the fees were, what the hourly rate was, and whether the services were reasonable. Well, there were numbers mentioned in some of the petitions, weren't there? I'm sorry? There were numbers mentioned in the process. In my interim fee petitions, as I amended them, it was additional time for a couple of months. I amended it because I wanted it to be heard. On the contribution petition filed before the trial, it was as of that day. There were no fees in there for what the trial included or the closing argument or any of the post-decree stuff. But my point is there were numbers in the petitions themselves. Yeah, prior to trial. Yes? So if the affidavit at the time in response to the September 26th order showed in excess of $140,000 in fees, you're saying that's not the total because that does not include any of your fees from the trial itself. Well, I would think $140,000 would be inclusive of the trial. So that's a figure that the trial court had. It was $140-some-thousand. I don't know the answer to that. You may be correct on that. If the court had that number and if the court denied fees, then the contribution petition is denied. But the other point is if the court says they have the ability to pay, Mr. Cervera lost his house and was sold. There's a 503-G trust on the vacant lot, which he one time referred $600,000. He makes $30,000 and he owes that child support. The $140,000 would, from your estimation, include everything. I believe so. And how is any of this impacted by the finding by the trial judge that the client is not credible at all with regard to this whole process, the whole hearing and the need for a hearing? So I don't think my issues are necessarily credibility issues. I think my issues are the statute and 501c1 and 503-G. Well, isn't there somewhat entwined in the fact that if there's a need to have hearings, but if there's a need to have hearings because someone is not telling the truth and lying, that certainly impacts the amount of time an attorney has to spend on a case also, doesn't it? Of course it does. And so you're going to look at this record and decide for yourself. I don't know what your impression of Richard Cervera is. He's a small contractor that took a job with the church and actually proved his circumstances at $30,000. Just curious, I know you don't want us to remand it to the trial court for a hearing on contribution, but if that is our decision, and we certainly have not discussed that, if that is our decision, who's going to pay your fees for the hearing on contribution? That's not an issue. And the reason is because the bill was so large I had to withdraw it. I couldn't continue on it. So an attorney has an independent right to contribution all of the time I've spent since I withdrew. That's all I know. You've answered my question. Thank you, Judge. Anything else about the case itself? Motorcycle. Thank you. We thank the three of you for your arguments this morning. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will stand in brief recess for a panel exchange.